The Surrogate.
I do not think that what Mr. Clinton asks the court to do comes within the statute. In this proceeding the usual prima facie case has been made ; the subscribing witnesses to the will having been called, examined and cross-examined as to the execution of the will, and also the person who had possession of the will before it was offered for probate. There are no allegations, supported as yet by affidavits produced by the contestant, and it therefore is not proper to require-the proponents to give cumulative evidence in the first, instance. The statute (Laws of 1837, ch. 460, § 17) leaves it within the discretion of the surrogate to call the person or persons who received the will from the testator, or that had the possession of it at any time before being offered for probate ; but he cannot require the proponents to produce and examine the lawyer who drew the paper. In this case, there is no proof adduced as to who drew the instrument in question. The witness merely said, that he heard some one say *306 that he thought it was drawn by a lawyer named Owen. Under these circumstances, there would be no propriety in requiring the proponents to go on and exhaust their case, and certainly not at this stage of the proceedings, when as yet no evidence to prove any fraud has been produced.
During the trial proponent’s counsel offered some testimony in regard to conversations by Mr. Taylor, after the date of the contested will, in reference to having made a will.
Contestant’s counsel objected to declarations of decedent as being incompetent on an issue of forgery, or simulated hand-writing.
The Surrogate.
The opinion of the court of appeals in Waterman v. Whitney (11 N. Y. [1 Kern.], 157) discusses the admissibility of declarations of a testator in cases where the validity of a will is disputed on the ground of fraud or duress in procuring its execution, or místale or some similar cause,—aside from the mental weakness of the testator,—and holds that no declarations of the testator himself can be received in evidence, except such as were made at the time of the execution of the will, and are strictly a part of the res gestee ; but the applicability of the rule to the case of disputed genuineness of signature seems not to have been considered, or, I believe, even referred to in that decision; and I hardly think such a question could have been in the mind of the court as within the classes of cases mentioned in the opinion. They appear to be cases of disputed validity arising under instruments recognized as genuine.
Here, and at this stage of the matter before me, the inquiry involved is: Is this a genuine signature of the decedent 1
The contestant claims it is not genuine, and has *307 offered letters of the decedent to show declarations, and, indeed, they were offered as declarations,—made subsequent to the date of the instrument, of such affection towards the contestant, as to be inconsistent, as her counsel claims, with the provisions of the paper in question; and that evidence was, I think, properly re ceived, as well in respect of the question of genuineness as that of alleged undue influence. It was, doubtless, offered as to both grounds, and, if I remember the other testimony of contestant correctly, I am strongly of the conviction that a fair and proper trial of this cause requires me, on established rules of evidence, to receive such declarations as are offered to be proved, in legitimate rebuttal of the evidence for the contestant; that is, such declarations as were made by the decedent during the short period of his life, after the date of the paper, that he had made a will, with any statement by him of its provisions as correspond with, so as to identify, the paper as the one referred to.
To exclude such declarations would be, as it appears to me, to reject matter, to say the least, clearly not immaterial to the principal question I am to determine upon this paper. The evidence should, however, be taken, not as direct proof, but only as corroborative of the testimony of the factum..
I do not discover that the decision and reasoning of the court of appeals precludes this view of the matter ; neither am I convinced by the case cited from 1 Lansing (Johnson v. Hicks, 1 Lans., 150), that I ought to exclude the evidence offered. * It will, therefore,' be received.
*308 II. March. Determination of application for probate.
Considerable testimony on the part of experts in handwriting was offered in the course of the trial, and that of the proponent admitted. On this kind of testimony the surrogate in his opinion spoke as follows.
E. W. Stoughton, Rufus ff. Andrews, and William H. Anthon, for proponents.
Henry W. Clinton, A. J. Yanderpoel, and D. R. Jaques, for contestant.
Hutchisgs, Suit.—In the views which I am about to express of the value of this character of testimony on the part of the contestant, I desire to be understood as including that on the part of the proponent.
In forming an estimate of the weight and value to be ascribed to the testimony given by expert witnesses employed for the specific purpose, a brief consideration of its claims to scientific accuracy must be premised.
It cannot be doubted that the evidence of these witnesses was based upon a minute examination of the material submitted to them for an opinion. This is very apparent in the elaborate analysis they have submitted to the court.- Every dot and tittle of the signature to the document here propounded as the last wfill and testament of the decedent, was closely examined, and its characteristics compared with those signatures which both parties claim to be genuine. Hot even the most minute changes and differences in the conforma *309 tion of different letters, or the relations of the various parts to each other, or the peculiar characteristics of the whole, escaped their searching observation. The appliances of photography, by which the minute parts could be magnified, and their appearance, when so enlarged, preserved, were resorted to by one of the experts on the part of the contestants, though the photographs were not admitted by the court in evidence. No means were left untried by which the differences between the signature to the propounded will and the five signatures in the case, as exhibits, could be magnified, and their importance dwelt upon.
The experts examined the curves and angularities of the strokes of the letters, the directions of the slope of the various parts, the amount of pressure exercised upon the down strokes, the point at which it was initiated, and the place it ceased ; the apparent rapidity with which the pen was carried to make the up or hair strokes, their regularity or irregularity, the size of the loops, the relative size of the different letters, and the comparative length of the different signatures. All that ingenuity could invent was resorted to, and the difference between the various signatures was presented in a manner that shows the great study devoted to the elucidation of the subject.
It is the practice of the courts, when it is necessary for their aid, to receive the evidence of men skilled in the various arts and sources of knowledge as experts, to elucidate the general principles or practical data upon which their science or art is based. In this manner chemists, civil engineers, physicians, or the representatives of any vocation or calling may be brought to the witness stand to testify in regard to the facts of their various professions. The chemist, in his particular business, may be asked to state the manner adopted in which poisons can be detected in food or eliminated from the human body. Again, his opinion may be de *310 sired upon the sufficiency of certain procedures to attain certain results. In either case it is necessary to remember that he is guided by common universal laws, known to every chemist, and that his testimony relates to their application. In this manner i't is occasionally necessary .for a court to require information from a civil engineer. It is the province of this profession to take cognizance of the effects of the elements upon materials used in constructing works ; to know the effect of the tides and of running waters ; to be able to estimate the durability and safety of structures erected in a particular manner, &c. But the value and weight of this kind of testimony are best exemplified in the evidence of physicians, skilled in mental diseases* in cases where the question of responsibility is involved. In these cases an expert can furnish information attainable in no other manner. The causes and progress of the disease, its development and modes of expression, together with the manner of determining its presence, can alone be furnished by those individuals whose profession it is to study and understand the diverse methods in which diseases of the mind and brain can be manifested. For purposes of illustration we will briefly contrast the basis of facts which underlie the testimony of experts in handwriting and experts in mental diseases, and then consider what may be the sources of fallacy, which, if they do not entirely vitiate, yet render the former less reliable than the latter.
The facts which the medical expert is called upon to elucidate are those parts of the common knowledge of his profession which relate to or have a bearing on mental disease. Those general principles which enable him, as a physician, to form a judgment upon particular cases, are explained to the court, and it may be that his professional opinion is solicited as to the bearing and significance of certain matters in evidence. In all cases, it must be borne in mind, the expert merely *311 reflects the light of his own calling upon matters which properly come within it. He refers to a series of analogous cases, and he supports himself by the opinions of the recognized standard authors on mental diseases. His opinion is valuable according to his experience and position. And his opinion is moreover supported by the analogy of cases and the agreement of the standard writers on the diseases of mind, that certain acts, characteristics, and appearances of a man whose sanity is disputed, are evidence of a certain disease.
How different is the case with any attempt to found a scientific basis for a system of expert evidence in handwriting will now be evident.
In the testimony of the witnesses called as experts, both on the part of the proponents and contestant, we have an illustration of the manner in which careful and painstaking study will discover alterations and differences imperceptible to the ordinary observer. These differences have been magnified, dwelt upon, and finally collated and submitted as proof of the non-genuineness of the signature “James B. Taylor” to the propounded will. It may be well for this court to speak fully and decisively as to the value it is disposed to ascribe to such evidence.
First. This evidence merely traces alterations and differences between the signature to the will and the five other signatures introduced as evidence, no attention being paid to the analogies between the former and the latter, nor to the differences between any two of the five, and none to the attending circumstances and conditions under which they were executed.
Second. These distinctions were to a certain extent drawn from the study of photographic copies of the signature of the will. This the evidence shows, though the court excluded on the trial the use of photographs.
Without commenting on the self-evident fact that a simple mark becomes a legal and valid signature when *312 properly witnessed, we will look for a moment at those ordinary every-day occurrences which produce among the daily signatures of any or all of us alterations as great or greater than were discovered between the signature to the propounded will on the one hand, and certain of the exhibits on the other. Where this has been done, it will be seen that no evidence of the nature here presented is entitled to any weight, unless supported by strong corroborative proof.
In the first place, it appears to me that the .mental condition of an individual must necessarily have an important influence upon the character of his writing. Instances of this nature are so common as scarcely to need illustration. Imagine a man overwhelmed with grief, or furious with anger, or under the effect of stimulants, attempting to write his name!
The momentary vexations of life are sufficient to produce appreciable alterations, while even such commonplace occurrences as the pressure of business or the state of the weather are not without influence. Taking, for example, the theory of the contestant (though not at this time passing on the fact), that the signature to the will is written with more steadiness and regularity than the five signatures which are in evidence as exhibits in the case (one is an indorsement on a promissory note, and the other four letters to his granddaughter when in Europe), may not this be considered as an evidence of the effect of mental condition upon handwriting % Is it improbable that a man of Mr. Taylor’s years who, so far as it appears from any evidence, had never before affixed his signature to so solemn a document as a will, an act which brought vividly before him, as it brings to all men, the certainty of death, and that death is necessary to ratify the decrees therein expressed, should write that signature with more deliberation than the many signatures which *313 he was in the habit of hastily and automatically affixing to checks, notes, letters, bills, &c. t
Of equal importance are the physical circumstances surrounding an individual; the height of the table at which he sits, the differences between sitting and standing, when he has to write in a posture to which he is unaccustomed, the flexibility and peculiar character of the pen or quill, the kind of ink, and the substance supporting the paper. A trial will speedily convince any one of the radical differences perceptible between two successive signatures when the only circumstance altered has been to write one on marble and the other on cloth; or when the difference is in the kind of paper —those accustomed to ruled paper may write badly on unruled—and the same may be said as to the peculiar quality of the paper, whether sized or unsized, the amount of light in the room, &c.
The circumstances affecting handwriting are almost numberless. The state of bodily health is another point. A natural condition of the parts of the body used in writing are of prime importance. A trifling blow on the arm, the effects of a slight fall, a rheumatic or neuralgic pang, or a gouty twinge may either completely annul or greatly modify the power and facility of writing.
Any one of these circumstances may completely vitiate all the learned disquisitions of these experts on what should be the exact uniformity of hairstrokes, base lines, loops and slopes.
A moment’s reflection will show how competent any one of the above circumstances may be to produce alterations in the handwriting which can be rendered apparent by a rapid scrutiny, such as was bestowed on Mr. Taylor’s signature ; and in this connection I may observe that, according to the testimony of one of the witnesses, Mr. Taylor suffered in his shoulder and *314 hands from a rheumatic ailment; a fact not known to the experts examined.
The fact that such differences were discovered by these experts will lose any significance when it is considered that the process they employed will produce like results when applied to several copies of almost any signature, provided they were made at different times and under different circumstances.
Are these witnesses who call themselves experts properly entitled to. the appellation ? They claim to have made the question of handwriting a specialty and profession, and it is contended that they are as properly experts as those in chemistry and diseases of the mind. How true this is can be seen when we reflect that it is not the mere profession and assumption of special knowledge, it matters not how such professions and assumptions are put forward, which entitle any individual to be considered an authority upon any point. The chemist who searches the viscera of a human being who has died with the symptoms of poisoning, looks for a substance which all chemists agree is detrimental to the human body, and acts in a certain manner. In his mode of procedure he is sustained by all of his profession, any one of whom knows the value and importance of each of his steps. In other words, all his steps are guided by general laws, the common property of all chemists.
When his investigations have, been pursued to a successful termination, and he has found the poisonous substance, he can demonstrate not only the steps of his progress, but the ingredients of the substance he has found. The expert in diseases of the mind does not pretend to testify as to the mental condition of an individual unless he has made a personal examination, or in the absence of that, he bases his opinions upon the whole evidence in the case; the language, acts, and physical appearance of the person whose sanity is to be *315 decided. What does the expert in handwriting profess to do ? He has no scientific basis of education, experience, or laws to build on. As in this case, he simply compares one signature with others, and notes some differences, the causes of which he does not attempt to explain, and which from his point of view are entirely unimportant in arriving at the conclusion that the same hand which wrote the signature to the will did not write the other five signatures. He is entirely ignorant how, when, and where those signatures were written; the mental, nervous, or physical condition of the writer ; or of any of the influences which practical common sense teaches have an effect on handwriting. ■
The mental and material influences are unknown to him. In fine, the writer was to him a stranger.
It appears by the evidence of one of the experts, in reply to a question from the court, that the signature to the will is written on a blue-ruled line, while in the cases of four of the exhibits the signatures are written on unruled paper.
How is it possible for them to tell the influence upon a man, with whom they were unacquainted, of being obliged to write his signature on a ruled line, when he may have been accustomed to write on unruled paper, as to its effect upon either rapidity or steadiness of motion % This is one of the many little but important material circumstances which concur to affect the handwriting, and which may be in itself sufficient to destroy all the theories of experts.
Moreover, after a careful consideration of the evidence of these experts, covering several hundred folios, it appears to me that the tendency of their system is so entirely analytical as to weaken, if not to lose the power of generalization.
While successful in pointing out the most minute differences and variations between certain letters and their lines and strokes, they completely fail to take that *316 comprehensive view of any of the signatures in question which is so apparent to a practical man. It appears to me that the intuitive generalization made by any one of the witnesses speaking from personal knowledge of the handwriting of Mr. Taylor, either on the part of the proponent or contestant, is óf more valuable assistance in the investigation as to the genuineness of the signature to the document here propounded, than either of the two experts called for the contestant, or of the expert called on the part of the proponent.
One of the experts called by the contestant, Albert S. Southworth, stated that his business was the examination of disputed handwriting; and that Ms business had been also photography, and that he used that art in his examinations.
This witness was asked to look at an exhibit which was marked for “identification,” and to say whether the name “James B. Taylor” was a correct photographic copy of the signature of the alleged will. The answer to this question was excluded by the court for the following reasons, as expressed on the trial:
“ The original signature to the alleged will has been presented to the witness, and he has examined it and compared it with the exhibits properly in evidence. That is the best evidence to be had, and he can speak from that. I shall exclude all testimony drawn from photographs, as being inadmissible, upon the question of handwriting. Such evidence would raise many collateral issues, as, for instance, the correctness of the lens, the' state of the weather, the skill of the operator, the color of the impression, purity of the chemicals, and other issues, which I think clearly require me to exclude such photographic evidence upon this question of genuineness of signature. It is, at best, secondary evidence.”
I shall consider the value of testimony based on photographic copies hereafter, in the consideration of the tes *317 timony of those witnesses, on the part of the contestant, whose opinions, given on the trial, were assisted, even if not positively formed, by photographic copies of different specimens of decedent’s handwriting, including signatures of different sizes.
[The learned surrogate then reviewed the conflicting testimony as to the genuineness of the signature to the will, an equal number of witnesses being examined on the side of contestant and of proponent. He then proceeded to consider the admissibility and value of photographs in evidence, in the following language.]
This is a summary of all the testimony of the witnesses on both sides who speak from personal knowledge of the handwriting and signature of the decedent, being thirteen in number for the contestant and the same number for proponents ; but I notice particularly that all the former expressed opinions which were founded, more or less, on a previous examination of what purported to be photographs of the signature to the will, and of other assumed signatures of the decedent, and so photographed in different sizes.
It is, therefore, important to consider tire use of these purported photographic reproductions of the signatures of Mr. Taylor, though excluded so far as they were offered to assist the expert, Southworth, in his examination, as they were used as a means of comparison by all of the witnesses but one on the part of the contestant, who testified from personal knowledge of the handwriting and signature of the decedent that the signature to the propounded will was not, in their opinion, genuine.
From the accurate study of them it must be evident from the testimony that two of the witnesses, Mr. Marsh and Mr. Van Yechten, changed their opinion as to the genuineness of the signature to the will. It is also evident from the testimony that from the study or examination of these photographs, as presented to them *318 by the counsel for the contestant, the data were furnished from which their opinions were prepared. The lines and loops, the strokes and angles that they dwelt upon were observed, measured, magnified, and noted in the photographic copies submitted to them by the counsel for the contestant.
The'same objections which maybe urged against the admission of these photographs in evidence hold good against the value of the opinions and deductions formed from their study. Too many collateral issues are involved to render them reliable testimony. Those who are familiar with the details of photography are aware of the many circumstances that would have to be made subjects of affirmative proof, and will readily appreciate this statement.
The refractive power of the lens, the angle at which the original to be copied was inclined to the sensitive plate, tire accuracy of the focusing, and the skill of the operator, and the method of procedure, would have to be investigated to insure the evidence as certain. The court would be obliged to suspend its examination as to the question of the genuineness of the signature, which is before it, and which is the primary evidence, to listen to conflicting testimony of the proponent and contestant as to who exhibits the most skill and perfectness in their photographic reproductions, and in fact to inquire into the whole science of photography.
When we reflect that by placing the original to be copied obliquely to the sensitive plate, the portion nearest to the plate may be distorted by being enlarged, and that the portion furthest from the plate must be correspondingly decreased, while the slightest bulging of the paper upon which the signature is printed may make a part blurred, and not sharply defined, we can form some idea of the fallacies to which this subject is liable.
Moreover, I cannot see, even if there be no possibility *319 of variations in the photographic reproduction from the original, what material assistance photography can be in this case. It is not claimed that the signature is traced over another signature, but that it differs. If it differs from the signatures which are exhibits in the case, it speaks for itself. It is not claimed that any man always writes exactly the same, but on the contrary the experts admit that a man varies in his signature in minute points, though the characteristics are always the same.
If the characteristics are the same, they should be apparent to the ordinary observation—otherwise they can hardly be called practical characteristics. I cannot, therefore, see why photography should have been brought into this case. Its tendency is rather to mislead than to help the witnesses who take these photographs as an assistance; for the reason that they start on the major premise, which is a fallacy, that the photograph of the signature which is alleged to be a forgery must correspond in its minute details with the signatures admitted to be genuine. Upon this premise they build up the differences and deduce the conclusion that the disputed signature does not correspond with the other signatures; a moment’s reflection, showing them that no two signatures of the same person are likely to correspond exactly, would convice them of the absurdity of the use of these photographs; as being merely means (provided they are correct) of magnifying the little differences which they could see, primarily, by examining the signatures themselves.
This sort of examination, though it may be useful, provided it be honestly and skillfully applied, to determine the genuineness of a bank-note, is of no avail when applied to handwriting. A forgery cannot be discovered by the same means as a counterfeit. In the latter case, where all the lines and impressions are produced by machinery always acting in the same way, *320 exercising the same amount of pressure on each occasion, and producing results which are mathematically alike, we have no comparison with the peculiar and in many respects unique process of handwriting.
In the former case we may resort to magnifying glasses and measuring scales with some hope of achieving satisfactory results ; in the latter case we c|n only appeal to personal knowledge of the individual’s handwriting, and even that is dependent upon his physical and mental condition at the time, and the circumstances of the occasion.
Nor is it claimed, as I have stated, that the signature which is disputed is a signature traced over another, so as to agree mathematically, but on the contrary it is claimed that it varies from the other signatures.
The signature to the will is the primary subject of evidence. It is the'only proper evidence from which to judge. Men are governed in their opinion of handwriting by the handwriting itself.
In what manner can photography make the signature, in any practical sense, more apparent to the observer than the signature itself ?
The operator may, morever, through fraud or skill, make some particular lines in the reproduced signature stand forth more prominently than in the original signature.
If the photograph bean absolutely perfect reproduction of the original signature—the former being the same as the latter—there can be no necessity for the study of the reproduction.
If, through the fraud or skill of the operator, some lines be brought out with undue prominence, then it should not be considered proper evidence on which to base an opinion, for it is not a correct reproduction. If, through the choice of the operator, he reproduces it on paper of such shade as to bring forth prominently certain lines, it certainly is not a proper basis for the or *321 dinary witness to form an opinion, who judges from a personal knowledge of the handwriting of the decedent, written, as all the exhibits show, on ordinary paper. But it is claimed that by photography we can magnify and bring out prominently the minute differences. But no mau forms his opinion of another’s handwriting from those characters which it is necessary to use a glass to make apparent. It does not appear that Mr. Marsh or Mr. Yan Yechten, or any of contestant’s witnesses, had Mr. Taylor’s signatures on notes, letters and documents with which they were thoroughly acquainted, either photographed or magnified.
They were acquainted with his natural signature.
Besides, is it not probable that any man whose signature is subjected to the process of photography, having such different reproductions presented to him, would be unsettled in his own belief as to its genuineness, if he had not been present at the experiments practised on it %
If photographs are properly excluded, for the reasons which I have given, as unnecessary, when the signature claimed to be a forgery is itself in evidence, then the opinions drawn from the study of those must be weakened. In the case of Mr. Yan Yechten and Mr. Marsh, after their examination of the will in the surrogate’s office, they pronounced the signature to be that of Mr. Taylor ; but when they were presented by the counsel for the contestant with the photographs, and had their attention called to various points, they changed their opinion, and pronounced it not to be like Mr. Taylor’s signature.
[The learned surrogate then reviewed at length the testimony of the subscribing witnesses, the testimony referring to a previous will, and that bearing on the domestic relations of the decedent and the contestant.
In relation to the declarations of the decedent his opinion was as follows:]
*322 Upon the proofs already adverted to,—if not otherwise overcome,—I should be compelled to regard the admissibility of the instrument in question to probate, as fully established ; and it only remains, now, for me to consider the value, force, and effect of the evidence of the contestant, offered as showing or tending to show that the instrument is wholly inconsistent with the affection, acts, and declarations of the decedent towards, or in respect of,' his granddaughter ; and if so wholly Inconsistent I am asked to decide that the paper is not genuine, and that the subscribing witnesses have committed willful and corrupt perjury, besides being accessory to the crime of forgery.
It is obvious that evidence of that character must be overwhelming, in order to impeach the genuineness of an instrument, supported by such positive testimony as I have before me.
A somewhat wider range of inquiry was allowed to the contestant in her proofs, in these respects, than now appears to have been necessary; but, at the time, I did not feel justified in confining counsel to such narrow or rigorous limitations, as might exclude testimony bearing on the possibility of the execution of a will in 1867, like the unexecuted paper prepared by Mr. Marsh, and found in the desk of the decedent (and by Mr. Marsh identified as the very paper that came from his office with the date of July 12, 1867, inserted, ready for execution),—and which might thus prove an executed, and not merely contemplated, testamentary purpose, more favorable in its terms to the contestant than the instrument now in question ; but the evidence presents no ground for believing that a will like the paper drawn by Mr. Marsh in 1867, was ever executed, and, not having been done, it is to be regarded as only expressing a purpose and disposition he then entertained, but afterwards held in suspense, and I must hold it to have been finally abandoned; and it is, there *323 fore, now to be considered like any other declarations of the decedent, made three years before the date of the propounded instrument, and indicating more liberal views of the disposition of his property towards his granddaughter; though as of little controlling weight, in the scale of evidence, compared with acts and declarations three years later, after the event of his granddaughter’ s marriage, and under the other circumstances proved in this case.
Notwithstanding a very considerable degree of latitude was allowed to the contestant in her proofs of the decedent’s declarations of intention to make a different disposition of his property in case of his death,—but, it appears, never executed by will,—embracing declarations as long ago as 1867, and offered in connection with the paper so drawn by Mr. Marsh, as tending to show that one like it had been consummated—I yet limited the proponents in their offers of declarations of the decedent, as to his making or having made a will (in rebuttal of the allegation of forgery of the propounded paper), to declarations made by the decedent, after the date of the paper now in question, that he had made a will, with any statements by him of any of its provisions corresponding with, so as to identify, the paper as the one referred to ; not to be taken, however, as direct proof, but only as corroborative testimony of the factum.
[After commenting upon some of the details of the evidence, on the part of the contestant, the ' surrogate proceeded as follows.]
On the other hand, the case furnishes the following testimony of declarations of the decedent made after the date of the propounded instrument (June 30, 1870), and corroborative of the fact of the existence and execution of such a paper; in my judgment, a class of evidence not' only admissible, but of great importance upon the question of genuineness of the factum, *324 when such declarations are proven by intimate and confidential Mends who are clear and positive in their statements and conversations, and especially when it appears that they were made under such circumstances as to show that the declarations were earnest and sincere, and could hardly have been misunderstood.
[The learned surrogate then reviewed the testimony of seven witnesses to declarations of testator, which had been admitted under the rule laid down; and finally, upon the whole case, concluded as follows :]
1. That the paper propounded for probate is the last will and testament of the decedent. •
2. That it was signed by him on the 30th day of June, 1870, and witnessed, and in all respects, executed according to the requirements of the statute.
It is, therefore, my decree, that the said instrument be admitted to probate as a will of real and personal estate.
Decree accordingly, reserving all questions of costs and allowances.
III. May 1871. Application for costs.
After entry of the decree counsel applied for an allowance of costs, out of the estate, under section 9 of the Laws of 1870, ch. 359, p. 826.
Henry L. Clinton and Aaron J. Vanderpoel, for the contestant.
Bufas F. Andrews and F. W. StougMon, for the proponent.
Mr. Anthon, for Mr. Duryea and Mrs. Weston. •
Farid B. Jaques, special guardian for the contestant.
*325 Hutchings, Suit.—This is an application by the counsel of the executors and also by the counsel of the granddaughter of the deceased, who contested the probate, for allowances for services on the trial before me as to the validity of the paper which, by the decree of this court, was admitted as the last will of the decedent; therein “ reserving all questions of costs and allowances for the further order of the court.”
There is no doubt, under the statute of 1870, relating to this court, of its power to grant allowances. It is, however, a discretionary power which should be exercised with great caution, and this case affords a fitting opportunity to express my views on the subject, inasmuch as the value of the estate is large, and if an allowance to the contestant were to be made, to be adequate, it would necessarily be a very considerable sum; and I deem it important to lay down some general rule on the subject, as there is, undoubtedly, a growing tendency to litigate the admissibility of wills to probate.
Cases, of course, arise in which the execution of such instruments is obtained by interested parties, under circumstances of undue influence on persons of feeble intellect or by fraud, when contests may be very reasonably made, and especially in cases of alleged insanity, when the line between capacity and incapacity is not easily determined ; but there seems to be a too-prevailing impression among relatives that unless a testator in his will makes provisions satisfactory to themselves they are warranted in contesting, with the expectation that they are to be indemnified in their expenses out of the estate, even if they fail in their opposition ; whereas, it should be understood that the principle which underlies the statute of wills is the right of the testator, provided he is of sound and disposing mind and, memory, and the forms of execution are complied with, to make even an arbitrary disposi *326 tion of Ms property, as it may please Mmself, to the disinheritance of those who, in case of intestacy, would take his estate ; and the power so given must be respected, and the exercise of it enforced by the courts, however repugnant to the general law of descent .and distribution of the estates of intestates.
It, therefore, seems to me that in entering upon a contest in a matter of probate, parties should do so in the same manner as in general litigation in other cases in the courts, and that counsel should rely solely upon their retainer and compensation from their clients, and that the clients themselves should, as in other cases, depend on the success of their opposition, subject, of course, to exceptional cases, such as those to which I have referred. Any other rule of conduct of contesting parties, in my judgment, tends not only to encourage unnecessary and groundless litigation in the anticipation of allowances to counsel, but exposes estates to great depreciation and loss on account of the suspension of the powers of executors under wills, during the controversy, in addition to the necessary charges of proponents’ counsel and disbursements, in sustaining the probate; and the case before me furnishes an example of such depreciation or liability to loss, as it appears that suits and proceedings of varidus kinds have been instituted against the estate in consequence of the inability of the executors to qualify and act in the execution of the will, in the payment of promissory notes of the testator to a very large amount, wMch have matured since his decease, and their ina-. bility to avoid, by the payment of interest, the foreclosure of mortgages, while there are also important executory contracts of the testator unfulfilled for the same reason, thus further exposing the estate to the risk of forfeiture or damages.
The case before me does not, in my judgment, come within the exceptional classes of contest to which I have *327 referred. There was no question of mental capacity involved, and I may say none of undue influence; for so slight was the evidence offered as to the latter, that the contestant’s counsel hardly contended at all for it, and finally wholly abandoned it. Indeed, no other ground of opposition was strenuously adhered to, than the claim of non-genuineness, which was supported by opinions of some witnesses against the positive testimony of unimpeached subscribing witnesses to the will, and other positive proofs of such a character as to be, according to my judgment, overwhelming.
The whole evidence in the case, I think, shows that contestant’s counsel depended, really, on the radical idea that the will offered could not be genuine, because its provisions ■ were unnatural; which I regard as an unsound theory, as the principal legatee had been his wife for nearly half a century, and the contestant herself was given an annuity of five thousand dollars during her life; and my experience in this court enables me to say that almost daily there are admitted to probate unquestioned wills, giving entire estates absolutely to widows, even where there are children surviving; and in this case, the only descendant being his grandchild, the contestant, there was no practical disinheritance, since the estate was not diverted from the family, but left the grandchild a liberal allowance annually, with a reasonable ' expectation, as I must suppose, that the grandmother, as the surviving custodian of the estate, would do by her as her grandfather would, if living, as the former was left with the power of free disposition ; and there appears not only to have been no disaffection, but, on the contrary, the strongest ties of affection on the part of the grandmother toward the contestant.
In view of the principles I have stated, and of the facts and circumstances of the case, as developed by the testimony on the trial (which I have reviewed for this purpose), I am unable to discover that there were *328 such reasonable grounds of opposition to the will, as to warrant me in ordering the payment of the charges of contestant’s counsel out of the estate, and, therefore, I deem it my duty to deny them motion.
As to the' application of the counsel for the executors for the payment of their charges out of the estate, considering that the bulk of the estate is left to Laura S. Taylor, the widow of the testator, and who is also an executrix, I shall make such allowance as may have her sanction, subject to my approval; but I cannot make such a direction as to the charges of the counsel for the two legatees, Mr. Duryea and Mrs. Weston.
In regard to the application of David R. Jaques, the special guardian of the contestant, for the payment of a suitable allowance to him for his services, I think it proper to reserve the question until the determination of the pending appeal from my former decree, by the supreme court.

 That case turned on the question of forgery, and in reference to the admissibility of declarations the court held (relying upon Waterman v. Whitney, and Jackson v. Betts; 6 Cow., 377), that upon the probate, declarations of the testator made before the factum, that he intended to give his property to the legatees named in the will, and declarations made by him after the factum, that he made such a will, *308 and stating who were the witnesses, and where the will was, were not admissible in proof of the execution of the will. But this point does not seem to have received so much consideration as others involved in the case, and the distinction pointed out by the surrogate in the case in the text, does not appear to have been adverted to.